**EXHIBIT 1**

# EXHIBIT 1

# LICENSE AGREEMENT

This License Agreement (the "Agreement") is made as of the ___7th___ day of June, 1991 (the "Effective Date") by and between MACROVISION CORPORATION, a California corporation ("Macrovision"), having its principal place of business at 700 El Camino Real, Suite 200, Mountain View, CA 94040, and GENERAL INSTRUMENT CORPORATION, a Delaware corporation ("GI") having a place of business at 6262 Lusk Boulevard, San Diego, CA 92121.

**1.0 Definitions.**

1.1 The "Process" shall mean Macrovision's process of modifying a video signal by the addition of a plurality of unipolar pulses and bipolar pulse pairs in and around the vertical blanking interval and by pseudorandomly phase modulating a color burst process, which process has been granted United States Patent Nos. 4,631,603, 4,577,216, 4,819,098 and related foreign counterpart patents.

1.2 The "Licensed Technology" shall mean the technology necessary for GI to design, develop and manufacture a custom integrated circuit for incorporation into an encoding or decoding component of its DigiCipher System, which circuit will allow application of the Process to Pay-Per-View Transmissions.

1.3 The "Device" shall mean an encoding and or decoding component of the DigiCipher System which incorporates the integrated circuit or other electronic hardware designed and developed by GI using the Licensed Technology, and which encoding or decoding component is used by the DigiCipher System Operator to apply the Process to the Pay-Per-View Transmission.

1.4 "Pay-Per-View Transmission(s)" shall mean a transmission of television programming for which the recipient customer pays an additional or separate fee to receive transmission of specific programs on a program by program basis.

1.5 The "Patents" shall mean the United States Patents, and the foreign counterpart patents relating to the Process and Licensed Technology listed in Exhibit A to this Agreement.

1.6 "DigiCipher System" shall mean GI's digital television compression and transmission system. The DigiCipher System is made up of various subsystems and electronic components.

05/17/91                                 1

1.7 "DigiCipher System Operator" shall mean any Television Receive Only programmer, Direct Broadcast System programming entity or consortium, Cable TV system operator, HDTV broadcaster or other similar entity transmitting pay-per-view television programming in the DigiCipher System format.

1.8 "Rights Holder" shall mean the owner of copyrights in any materials to be transmitted in any Pay-Per-View Transmission.

1.9 "Use Fee" shall mean monies Macrovision receives from a Rights Holder or DigiCipher System Operator for the application of the Process to a Pay-Per-View Transmission.

2.0 Grant of Rights.

2.1 Subject to the terms and conditions of this Agreement, Macrovision hereby grants to GI, and GI hereby accepts from Macrovision, the following nonexclusive, nontransferable worldwide rights and licenses during the term of this Agreement:

    a. The right to use the Licensed Technology to design and develop the Device; and

    b. The right to manufacture, sell and distribute the Device as an integral part of the DigiCipher System; and

    c. The right to use the Macrovision trademark or tradename in connection with the identification, advertisement, marketing and/or sale of the DigiCipher System and related products.

2.2 GI agrees that the Device shall be designed and developed to permit DigiCipher System Operators to utilize the Device for a specific Pay-Per-View Transmission. GI further agrees that it will make reasonable efforts to add a future feature to the Device or the DigiCipher System that will permit selective use of the Device by individual viewers during any specific Pay-Per-View Transmission.

2.3 GI acknowledges and agrees that section 2.1 sets forth any and all rights of GI with respect to the Licensed Technology and the Process, and that nothing contained in this Agreement shall be deemed to grant GI any additional rights thereto except as expressly provided herein. GI agrees and acknowledges that it has no right to use the Process on any Pay-Per-View Transmission, and that it shall not knowingly allow or permit others to use the Process on any Pay-Per-View Transmission unless authorized to do so by Macrovision. GI further agrees and acknowledges that GI shall not be permitted to use the Licensed Technology for any purpose other than as authorized by section 2.1 of this Agreement.

### 3.0 Development Expenses.

GI agrees and acknowledges that it shall be solely responsible for the design, development, manufacture and distribution of the Device and the DigiCipher System. GI further agrees and acknowledges that the design, development, manufacture, and integration of the Device into the DigiCipher System shall be at GI's sole expense.

### 4.0 Payments to Macrovision.

4.1 In consideration of the rights granted hereunder, GI agrees to pay to Macrovision the following amounts:

a. The sum of two hundred thousand dollars ($200,000), fifty percent (50%) payable within thirty (30) days of the Effective Date of this Agreement, and fifty percent (50%) payable immediately upon completion of a formal successful subjective test. The intent of the test is to demonstrate that the Process does not result in significant playability problems with respect to consumer viewing of original video programs protected by the Process. (A playability problem is defined as one where consumers complain or demand a refund after viewing original pay-per-view programs because of video artifacts in the original program caused by the Process.) A successful test is defined as one that has no more than a three (3%) percent playability problem as described above in this Section 4.1.a. Such test shall be coordinated by Macrovision and administered, conducted and analyzed by a market research testing company mutually agreed upon by Macrovision and GI. GI will not unreasonably withhold agreement on the approval of the market research firm or the methodology for the test. GI will make every effort to respond on a timely basis to issues involving the test. Macrovision will sponsor and direct the research. The test will employ a statistically significant and representative sampling of viewers, TV sets and viewing material.

b. The sum of twenty-five thousand dollars ($25,000) for each DigiCipher System Operator which, after purchasing, licensing, leasing, renting, or otherwise acquiring the right to use one or more DigiCipher Systems, makes commercial use of the Process, until such time as GI has paid to Macrovision a total of five hundred thousand dollars ($500,000) under this subsection 4.1(b). Thereafter, GI shall have no further payment obligations under this subsection 4.1(b). Payment under this subsection 4.1(b) shall accrue upon first commercial use by each DigiCipher System Operator of the Process. For purposes of this subsection 4.1(b), first use of the Process by the DigiCipher System Operator shall be deemed to occur at such time as Macrovision notifies GI that it has entered into an agreement with a Rights Holder or the DigiCipher System Operator for application of the Process to a Pay-Per-View transmission maintained by such DigiCipher System Operator through the DigiCipher System and such DigiCipher System

05/17/91                                3

Operator makes commercial use of the Process for a Pay-Per-View Transmission.

c. In the case of a Cable TV system operator, to qualify as a DigiCipher System Operator and thereby trigger a $25,000 payment from GI to Macrovision upon first commercial use of the Process, such Cable TV system operator must be transmitting Pay-Per-View Programming in the DigiCipher format; that is, digitally compressed programming must be transmitted through a Cable TV system to Cable TV subscribers' DigiCipher set-top decoders.

4.2  Unless otherwise provided herein, payments due under section 4.1(b) shall be made within thirty (30) days after the close of the calendar month in which such payments accrue. Each payment shall be accompanied by a written statement in form reasonably satisfactory to Macrovision specifying the amount of payment due Macrovision and the means of calculation thereof. Each statement shall be certified as true and correct by the Vice President, Finance of the VideoCipher Division of GI. Any payment which is not timely paid shall be increased by a late charge imposed at the rate of twelve percent (12%) per annum, or, if less, the maximum rate permitted under applicable law, from thirty (30) days after the due date of such payment until the date of actual payment.

5.0  Maintenance and Inspection of Records.

5.1  GI shall maintain accurate books and records reflecting the number of DigiCipher System Operators to which GI sells or otherwise transfers a DigiCipher Encoding System capable of applying the Process, the name and location of each such DigiCipher System Operator, the number of Devices sold or transferred, and such other information as Macrovision may from time to time reasonably request with respect to the incorporation of the Device into the DigiCipher System, and the use of the Process by such DigiCipher System Operators.

5.2  Macrovision shall have the right, at least once per calendar year during the term of this Agreement and for three (3) years thereafter, to have independent certified public accountants review or audit all records of GI relating to this Agreement. All audits will be at Macrovision's expense, and will be begun upon at least forty-eight (48) hours prior notice. All reviews and audits will be in confidence, and the auditors will disclose to Macrovision only the information necessary to verify payments due, and the auditors will execute a Non-Disclosure Agreement with GI, in form and content satisfactory to GI, prior to conducting such audit.

6.0  Use of the Process by DigiCipher System Operators.

GI agrees and acknowledges that it shall not apply the Process or authorize any third party to apply the Process to any Pay-Per-View Transmission without Macrovision's prior written permission. GI acknowledges that only Macrovision shall be entitled to authorize any

05/17/91                                    4

DigiCipher System Operator to apply the Process at such time as Macrovision and the applicable DigiCipher System Operator, or, as the case may be, Rights Holder, have entered into an agreement. GI further agrees that at such time as Macrovision notifies GI that it has entered into an agreement with a DigiCipher System Operator or Rights Holder, GI shall provide all reasonable necessary assistance, including, but not limited to, enabling such DigiCipher System Operator to use the Process. GI also agrees to use its best efforts to assist Macrovision in preventing any unauthorized use or circumvention of the Process.

7.0 Use Fee Charges and Payments to GI.

7.1 Macrovision shall have complete discretion in negotiating and defining the terms and conditions of any agreement with a Rights Holder or DigiCipher System Operator for application of the Process to Pay-Per-View Transmissions through the use of a DigiCipher System. Macrovision shall use its best efforts to enter into agreements contemplated by this section 7.1 with all reasonably qualified and reputable entities upon reasonable terms and conditions not inconsistent with Macrovision's customary terms and conditions offered to similar entities under this Agreement. Provided that, if, within a reasonable period of time before the transmission of an applicable Pay-Per-View Transmission, Macrovision and the Rights Holder or DigiCipher System Operator are unable to agree upon a Use Fee, Macrovision shall agree to a Use Fee which does not exceed one percent (1%) of the retail price charged to the individual consumer/viewer for the Pay-Per-View Transmission on a DigiCipher System. For purposes of this subsection 7.1, retail price shall include monies paid by a consumer/viewer to allow the consumer/viewer to copy such Pay-Per-View Transmission when other consumers/viewers are receiving the Pay-Pay-View Transmission with the Process.

7.2 Macrovision further agrees that in consideration of the promises made by GI hereunder, Macrovision will pay to GI an amount equal to thirty-five percent (35%) of Macrovision's Net Receipts from Use Fees charged to Rights Holders or DigiCipher System Operators under the agreements contemplated in sections 6.0 and 7.1 above. For purposes of this section 7.2, "Net Receipts" shall mean the gross Use Fees actually received by Macrovision less any sales, use, excise or other taxes, and reasonable and customary amounts paid to third parties for reporting the use of the Process and any other third party payments agreed in advance by Macrovision and GI in writing.

7.3 Within thirty (30) days of the close of each calendar quarter, Macrovision agrees to furnish to GI a report showing the gross Use Fees, any deductions as outlined in Section 7.2, and Net Receipts received by Macrovision during the quarter, and a calculation of the payments due to GI for such period. At the time of each such report, Macrovision will pay GI the net amount of payments due.

7.4 GI shall have the right, at least once per calendar year during the term of this Agreement and for three (3) years thereafter, to have independent

05/17/91                                    5

certified public accountants review or audit all records of Macrovision relating to this Agreement. All reviews and audits will be at GI's expense, and will be begun upon at least forty-eight (48) hours prior notice. All reviews and audits will be in confidence, and the auditors will disclose to GI only the information necessary to verify payments due.

8.0 Proprietary Rights.

8.1 GI recognizes and agrees that the Process and the Licensed Technology are the proprietary property of Macrovision and that GI has only such rights therein as are expressly licensed by Macrovision to GI hereunder.

8.2 Upon the mutual agreement of Macrovision and GI, GI will display in conjunction with the DigiCipher System a notice in form and substance approved by Macrovision stating that the DigiCipher System is capable of applying an anticopying process and including Macrovision's trademark or tradename applicable to such process.

9.0 Quality Control.

GI shall employ such reasonable quality standards with respect to the use of the Licensed Technology as shall be required to design, develop and manufacture Devices capable of properly applying the Process. GI further agrees to employ such reasonable quality standards with respect to the integration of the Device into the DigiCipher System. In addition, as and when reasonably requested by Macrovision, GI shall furnish to Macrovision random samples of the Device as developed by GI not to exceed three (3) Devices in any given calendar year. Macrovision shall have the right to test such Device samples to insure that they properly apply the Process, and that the ability to apply the Process is carefully controlled and limited to those DigiCipher System Operators authorized by Macrovision to apply the Process. GI further agrees to furnish to Macrovision access to testing equipment, and/or facilities, if so reasonably requested by Macrovision, where Macrovision can test both the Devices and the DigiCipher System to insure that they are capable of properly applying the Process to Pay-Per-View transmissions. GI agrees that it will allow Macrovision, at Macrovision's expense, to conduct testing of the Process embedded in the DigiCipher System prior to the sale or ownership transfer of DigiCipher Systems capable of applying the Process.

10.0 Macrovision Proprietary Rights Indemnification.

10.1 Macrovision will indemnify GI against any and all third party claims of patent infringement which may be asserted against GI because of GI's use of the Licensed Technology and/or manufacture and distribution of the Device in accordance with the terms and conditions of this Agreement. Macrovision shall have the right to defend against, control the defense of, and settle any action based upon any such claims. Macrovision will bear all costs and expenses, including reasonable attorneys' fees, incurred in

connection with the defense of any such claims or as a result of any settlement made or judgment rendered on the basis of such claims. Macrovision's obligations under this paragraph shall arise only if GI (a) promptly notifies Macrovision in writing when any such claim is made, (b) has materially complied with the terms of the Agreement, (c) furnishes such information and assistance as Macrovision may reasonably request in connection with the defense, settlement or compromise of such claim, and (d) does not enter into any settlement of any such claim without Macrovision's prior written consent.

10.2 GI shall have the right to participate in any defense action or settlement negotiations concerning a claim of patent infringement against GI with respect to the use of the Licensed Technology and/or manufacture and distribution of the Device by GI. Macrovision shall not be responsible for any expenses incurred by GI in its participation in such defense or settlement, except to the extent that such expenses are incurred in connection with the primary defense or settlement effort on GI's behalf and are otherwise required to be borne by Macrovision pursuant to the preceding paragraph.

10.3 Notwithstanding the foregoing, Macrovision shall not be liable to GI in any manner for any claim described in Section 10.1 due to GI's combination or modification of the Licensed Technology for use in the DigiCipher System if such claim would have been avoided in the absence of such combination or modification. In such instance, GI shall indemnify and hold Macrovision completely harmless from and against any suit, claim proceeding or damages (including any court costs, reasonable attorneys' fees, and related litigation expenses) suffered by Macrovision arising out of or related to any circumstance described in this section 10.3. GI's obligations under this paragraph shall arise only if Macrovision (a) promptly notifies GI in writing of any such suit, claim or proceeding, (b) has materially complied with the terms of this Agreement, (c) allows GI to direct the defense of and/or handle such suit, claim or proceeding at GI's expense, (d) gives GI all information and assistance reasonably necessary to defend the same at GI's expense, and (e) does not enter into any settlement of the suit, claim or proceeding without GI's prior written consent.

10.4 If any legal action alleging patent infringement is commenced, or any threat thereof is made, against either party hereto with respect to the use of the Licensed Technology, and/or manufacture and distribution of the Device by GI pursuant to the terms of this Agreement, Macrovision shall have the right, but not the obligation, to do any of the following: (a) procure for the benefit of GI at Macrovision's expense the right or license to any technology alleged to have been infringed by the Device, or (b) require GI to discontinue its manufacture and distribution of the Device in conjunction with the DigiCipher System under this Agreement within a reasonable period of time until such action or threatened action is resolved to Macrovision's reasonable satisfaction, unless GI agrees that it will be responsible for any damages arising out of GI's continued manufacture or distribution of the Device after Macrovision's request for discontinued manufacture and distribution.

10.5 Except as expressly provided in section 10.1, Macrovision shall not be liable to GI for damages arising out of or resulting from the use of the Licensed Technology and/or the manufacture and distribution of the Device by GI. Furthermore, Macrovision's liability to GI for indemnification and damages arising under this Section 10 shall be limited to ten million ($10,000,000) dollars.

THE FOREGOING IS MACROVISION'S EXCLUSIVE OBLIGATION WITH RESPECT TO CLAIMS OF INFRINGEMENT OF PROPRIETARY RIGHTS OF ANY KIND. MACROVISION WILL NOT BE LIABLE FOR ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, EVEN IF MACROVISION IS INFORMED OF THE POSSIBILITY THEREOF IN ADVANCE.

11.0 GI Indemnification.

Except as provided in section 10.0 above, GI agrees to defend, indemnify, and hold Macrovision harmless from and against any and all damages, liabilities and costs (including reasonable attorneys' fees and litigation costs) arising out of claims made against Macrovision that the Device and/or the DigiCipher System is defective in design or manufacture or breaches any warranty or other commitment by which GI is bound with respect to the Device and/or DigiCipher System.

12.0 Disclaimer of Warranties and Limitation of Liability.

EXCEPT TO THE EXTENT REQUIRED BY LAW, MACROVISION MAKES NO WARRANTIES, EITHER EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING, WITHOUT LIMITATION, THE CONDITION OF THE LICENSED TECHNOLOGY, ITS MERCHANTABILITY, OR ITS FITNESS FOR ANY PARTICULAR PURPOSE. IN NO EVENT SHALL MACROVISION BE LIABLE FOR ANY DIRECT, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES OF ANY NATURE OR KIND WHATSOEVER, INCLUDING, BUT NOT LIMITED TO, LOSS OF PROFITS OR OTHER ECONOMIC LOSS ARISING OUT OF THE LICENSING OF THE LICENSED TECHNOLOGY BY MACROVISION OR THE MANUFACTURE AND DISTRIBUTION OF THE DEVICE BY GI.

13.0 Term and Termination

13.1 This Agreement shall commence on the Effective Date and shall continue indefinitely until terminated as set forth below.

13.2 In the event of a material breach by either party in the performance of its duties, obligations or undertakings under this Agreement, the other party shall have the right to give written notice to the breaching party advising such party of the specific breach involved. If the breaching party shall not have remedied such breach within thirty (30) days after such notice, the other party shall have the right, in addition to any other rights and remedies it may have, to terminate this Agreement immediately upon written

notice to the defaulting party.

13.3 In the event either party is declared bankrupt, or makes an assignment for the benefit of creditors, or a receiver or trustee is appointed to oversee a substantial part of its assets, or it becomes unable to pay its general debts then due, or it goes into liquidation or winding up, then the nonbankrupt party shall have the immediate right to terminate this Agreement.

13.4. Notwithstanding anything in Section 4.0 to the contrary, in the event that the Patents shall be adjudicated by way of a final judgment or similar order by a court of competent jurisdiction to be invalid, this Agreement may be terminated by GI and be of no further force and effect, subject only to those provisions which expressly survive a termination or expiration of this Agreement.

13.5 Notwithstanding the foregoing, this Agreement shall automatically and immediately terminate upon the expiration of the Patents.

13.6 Notwithstanding anything in Section 4.0 to the contrary, in the event the Process causes material visible artifacts to appear in more than two percent (2%) of the television sets during the original viewing of any Pay-Per-View Transmission and such artifacts are reported to GI through customer complaints, then GI shall notify Macrovision of the problem. In such event, the parties agree to reasonably cooperate to resolve such problem. In the event that GI and Macrovision mutually agree that such problem is not reasonably resolvable, this Agreement may be terminated by GI and be of no further force and effect, subject only to those provisions which expressly survive a termination or expiration of this Agreement. Further, if Macrovision is notified of such problem within the first nine (9) months after the first Pay-Per-View Transmission which uses the Process, such problem is not resolved within six (6) months thereafter, and GI elects to terminate this Agreement, GI shall be entitled to a refund of half of all payments made under Section 4.0.

13.7 Upon the termination of this Agreement:

a. Except to the extent required by law, all rights granted to GI under this Agreement immediately shall revert to, and vest in Macrovision, and absolutely no interest whatsoever in any of such rights shall thereafter remain in GI; and

b. Except for termination under subsections 13.4 or 13.5 above, GI shall immediately cease the manufacture and distribution of the Device in conjunction with the DigiCipher System, and shall return immediately to Macrovision any and all samples, specifications, drawings, designs, photocopies, and other materials provided by or otherwise obtained from Macrovision under this Agreement. Macrovision shall be entitled to injunctive relief and/or a writ of possession to enforce its rights under this provision.

13.8 No termination of this Agreement shall in any manner whatsoever release, or be construed as releasing, any party from any liability to the other arising out of or in connection with a party's breach of, or failure to perform, any covenant, agreement, duty or obligation contained herein. Failure of a party to elect to terminate this Agreement in accordance with section 13.2 hereof in the event of a breach by the other party shall not serve to limit the rights and legal and equitable remedies available under applicable laws to the non-breaching party on the basis of such breach.

## 14.0 Confidential Information

14.1 Macrovision and GI (including their respective officers, employees and agents) each agree to use all reasonable efforts to keep strictly secret and confidential and not to use, or permit the use of, for any purpose whatsoever during the term of this Agreement and at any time thereafter, all confidential information acquired from the other party, whether prior to or during the term of this Agreement, except as disclosures or use of such information is expressly permitted by this Agreement or by a writing signed by the parties hereto. To that end, without limiting the generality of the foregoing provision, Macrovision and GI each agree to cause all written materials and other documents relating to or containing such information obtained from the other party and designated by that party to be confidential to be plainly marked to indicate the secret and confidential nature thereof and the prevent the unauthorized use or reproduction thereof. The obligations imposed by this Section 14.1 shall not apply with respect to any information which is or becomes published or otherwise is generally available to the public other than through the fault of the other party hereto.

14.2 Each party acknowledges that in the event it breaches any provision of this section 14, the other party may be irreparably harmed and may not have an adequate remedy at law. In the event of any breach or threatened breach of this section 14, each party shall be entitled to injunctive relief to enforce its rights hereunder, without being required to post any bond or other security.

14.3 The obligations of the parties under this section 14 shall survive the term and termination of this Agreement and shall remain in full force and effect regardless of the cause of any termination.

## 15.0 Television Set Compatibility

Macrovision shall use its reasonable best efforts to work with the major TV set manufacturers to ensure that currently produced and future TV sets will not exhibit playability problems resulting from the Process.

## 16.0 Miscellaneous Provisions.

16.1 Governing Law. This Agreement shall be governed by and interpreted in accordance with the laws of the State of California, without regard to California's laws or any other jurisdiction's choice of law principles.

05/17/91                                   10

16.2 Excise Taxes. The parties anticipate that there will not be any sales tax, use tax, or other excise tax imposed upon the transactions set forth in this Agreement. However, in the event that any sales tax, use tax, or other excise tax is imposed upon Macrovision by any jurisdiction with respect to such transactions, GI shall reimburse Macrovision the amount of any and all such taxes paid by Macrovision to the fullest extent permitted by law.

16.3 Rights Cumulative. Each and all of the various rights, powers and remedies of the parties shall be considered to be cumulative with and in addition to any other rights, powers and remedies which such parties may have at law or in equity in the event of breach of any of the terms of this Agreement. The exercise or partial exercise of any right, power or remedy shall neither constitute the exclusive election thereof nor the waiver of any other right, power or remedy available to such party.

16.4 Notices. All notices, consents or demands of any kind which either party to this Agreement may be required or may desire to serve on the other party in connection with this Agreement shall be in writing and may be delivered by personal service or by registered or certified mail, return receipt requested, deposited in the United States mail with postage thereon fully prepaid, addressed to the party at the address set forth in the initial paragraph of this Agreement. Service of any such notice or demand so made by mail shall be deemed complete on the date of actual delivery as shown by the addressee's registry or certification receipt. Each party hereto may from time to time, by notice in writing served upon the other as aforesaid, designate a different mailing address or a different person to which such notices or demands are thereafter to be addressed or delivered.

16.5 Severability. If any of the provisions of this Agreement are held to be void or unenforceable, the parties agree that such determination shall not result in the nullity or unenforceability of the remaining portions of this Agreement. The parties further agree to replace such void or unenforceable provisions of this Agreement with valid and enforceable provisions which will achieve, to the extent possible, the economic, business and other purposes of the void or unenforceable provisions.

16.6 Counterparts. This Agreement may be executed in separate counterparts, each of which shall be deemed an original, and when executed, separately or together, shall constitute a single original instrument, effective in the same manner as if the parties had executed one and the same instrument.

16.7 Entire Agreement. This Agreement is intended by the parties to be the final expression of their agreement and constitutes and embodies the entire agreement and understanding between the parties hereto and constitutes a complete and exclusive statement of the terms and conditions thereof, and shall supersede any and all prior correspondence, conversations, negotiations, agreements or understandings relating to the same subject matter.

16.8 Amendments. No change in, modification of or addition to the terms and conditions contained herein shall be valid as between the parties unless set forth in a writing which is signed by authorized representatives of both the parties and which specifically states that it constitutes an amendment to this Agreement.

16.9 Waiver. No waiver of any term, provision, or condition of this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be, or be construed as, a further or continuing waiver of any other term, provision or condition of this Agreement.

16.10. Assignment. Neither party shall assign this Agreement or any rights or obligations hereunder without the other party's prior written consent except to (1) a company, partnership, or other business entity wholly controlled or owned by either party, (2) an affiliated person in which such assigning party holds or owns a controlling interest, (3) a purchaser of all or substantially all the assets of either party or of the business to which this Agreement relates or any person or entity into which such party is merged or consolidated, or (4) a parent company.

16.11 Binding on Successors and Assigns. Subject to the restrictions of section 16.10, this Agreement and all of its terms, conditions and covenants are intended to be fully effective and binding, to the extent permitted by law, on the successors and permitted assigns of the parties hereto.

16.12. Captions. Captions are provided in this Agreement for convenience only and they form no part of this Agreement and are not to serve as a basis for interpretation or construction of this Agreement, nor as evidence of the intention of the parties hereto.

16.13. Disclaimer of Agency. Nothing contained in this Agreement is intended or shall be construed so as to constitute the parties to this Agreement as partners or joint venturers or as agents of each other. Neither party shall have any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other party or to bind the other party in any contract, agreement or undertaking with any third party.

In Witness Whereof, this Agreement has been executed and delivered by the parties hereto as of the Effective Date.

MACROVISION CORPORATION     GENERAL INSTRUMENT CORPORATION

By: *[signature]*             By: *[signature]*

Title: President              Title: Vice President

# EXHIBIT A
## Patents

| Description (Country) | Application Number | Application Date | Patent Number | Issued Date |
|---|---|---|---|---|
| **VHS Process** | | | | |
| United States | 724,006 | 04/17/85 | 4,631,603 | 12/23/86 |
| Australia | 56077/86 | 04/14/86 | 577,011 | 01/24/89 |
| Austria | | | E48356 | 11/29/89 |
| Belgium | | | 0199553 | 12/13/89 |
| Canada | 506,670 | 04/15/86 | 1256558 | 06/27/89 |
| China | 86.102600 | 04/16/86 | 3679 | 08/30/89 |
| Europe | 86/302890.8 | 04/17/86 | 0199553 | 12/13/89 |
| France | | | 0199553 | 12/13/89 |
| Italy | | | 0199553 | 12/13/89 |
| Liechtenstein | | | 0199553 | 12/13/89 |
| Luxembourg | | | 0199553 | 12/13/89 |
| Netherlands | | | 0199553 | 12/13/89 |
| New Zealand | 215,693 | 04/03/86 | 215,693 | 04/03/86 |
| Pakistan | 162/86 | 04/15/86 | 130231 | |
| Phillipines | 33,660 | 04/16/86 | 23758 | 11/03/89 |
| South Africa | 86/2491 | 04/03/86 | 86/2491 | 04/03/86 |
| Spain | 554,085 | 04/17/86 | 554,085 | 04/17/86 |
| Sweden | | | 0199553 | 12/13/89 |
| Switzerland | | | 0199553 | 12/13/89 |
| Taiwan | 75102450 | 05/31/86 | 26,650 | 01/01/87 |
| United Kingdom | | | 0199553 | 12/13/89 |
| Germany | | | 0199553 | 12/13/89 |
| Argentina | 307,831 | 06/09/86 | | |
| India | 279/CAL/86 | 04/10/86 | | |
| Ireland | 992/86 | 04/16/86 | | |
| Japan | 087236/86 | 04/17/86 | | |
| South Korea | 86-2868 | 04/15/86 | | |
| Mexico | 2102 | 04/09/86 | | |
| Thailand | 004,386 | 04/16/86 | | |
| **Colorstripe Process** | | | | |
| United States | 551,696 | 11/14/83 | 4,577,216 | 03/18/86 |
| **Intermediate VIIS Process** | | | | |
| United States | 038,163 | 04/14/87 | 4,819,098 | 04/04/89 |